

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ MAY 17 2006 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED BOATMEN, et al., ) | No. 06-CV-400 (JBW) |
| ) | |
| Plaintiffs, ) | |
| ) | MEMORANDUM, ORDER |
| v. ) | AND FINAL JUDGMENT |
| ) | |
| CARLOS GUTIERREZ, in his official capacity ) | |
| as Secretary of the United States Department of ) | |
| Commerce, et al. ) | |
| ) | |
| Defendants. ) | |

---

Appearances:

| | |
|---|---|
| For all Plaintiffs: | Law Office of Philip L. Curcio<br>Melville, New York<br>By: Philip L. Curcio |
| | Bogan & Bogan, LLC<br>Point Pleasant Beach, New York<br>By: Raymond D. Bogan |
| For Defendants Carlos Gutierrez, National Oceanic and Atmospheric Admin., National Marine Fisheries Service: | United States Attorney's Office<br>Central Islip, New York<br>By: Robert B. Kambic |
| For Defendant Atlantic States Marine Fisheries Commission: | Law Office of Sean H. Donahue<br>Washington, D.C.<br>By: Sean H. Donahue |
| For Defendant State of Connecticut: | Connecticut Office of the Attorney General<br>Hartford, Connecticut<br>By: Sharon Anne Scully |



For Defendant State of New York: New York State Office of the Attorney General
Environmental Protection Bureau
New York, New York
By: Gregory J. Nolan

Amicus Natural Resources Defense Council:
Natural Resources Defense Council
New York, New York
By: Amelia Evangelista Toledo

JACK B. WEINSTEIN, Senior United States District Judge:

**Table of Contents**

| | | |
|---|---|---:|
| I. | Introduction | 3 |
| II. | Facts | 4 |
| III. | Law | 6 |
| | A. Standard of Review of Administrative Decisions | 6 |
| | B. Fishery Quotas | 7 |
| | C. Standard for Granting Summary Judgment | 8 |
| IV. | Application of Law to Facts | 8 |
| V. | Declaratory Judgment | 10 |
| VI. | Conclusion | 11 |
| | Appendix A | 13 |

I.  **Introduction**

Plaintiffs are commercial and recreational fishermen suing various administrative officers and bodies that control the amount of fluke that can be taken from waters off the East Coast of the United States during the 2006 fishing season. At the court's direction, all parties have moved for disposition on an expedited basis. After consideration of the considerable administrative record, summary judgment for defendants is granted.

Administration of the Atlantic summer flounder (fluke) fisheries is exceptionally complex, necessitating a sensitive balancing and cooperation among many interests. The fish are pelagic with their eggs floating on the open sea, subject to the vagaries of current, tide, temperature, and non-human predators. The federal government controls the habitat from three miles out, with the competing states individually administering their own waters up to the three mile limit. Commercial and sport fisheries vie for shares within each state's waters, with the individual states controlling total landings by fixing dates and areas for the fishing season, and minimum size. The fish move freely across boundaries, particularly in the spring, crossing the three mile limit towards the shore. The effects on the tourism industry, fishing fleets, rod, tackle and bait shops as well as fishing devotees and gastronomes requires the exercise of substantial political wisdom. Under the circumstances—as well as the law—conservative projections to protect this important resource are warranted. The decisions now challenged, taken by the various administrative bodies involved, were well calculated to protect jobs as well as the pleasure of the public into the foreseeable future, as required by law. Conservation has been served without unnecessary harm to other interests, including those of plaintiffs.

## II. Facts

Summer flounder, commonly known as fluke, are flat, demersal finfish found along the Atlantic coast of North America. They are one of the most sought after fish by commercial and recreational anglers. Fluke catch limits are subject to an array of regulations by state and federal administrative bodies. Appendix A lists some of the bodies, statutes, regulations, and acronyms necessary to understand the full four volume administrative record ("AR") and the extensive briefs, with which the parties and interested persons are assumed to be familiar.

A scientific assessment of the status of the fluke stock was conducted by the Northeast Fisheries Science Center (the "Center") in June 2005, at the 41st Northeast Regional Stock Assessment Workshop ("SAW"). The SAW process convenes scientists from around the world who are experts in fisheries stock assessment methodology. AR 200-297. The SAW assessment uses data from the Center research cruises as well as from various fishery surveys. AR 200, 519. The assessment also employs recreational summer flounder catch and landing estimates generated by the Marine Recreational Fishing Statistical Survey ("MRFSS"). AR 201, 519.

The Stock Assessment Review Committee ("SARC") indicated that the fluke stock was being overfished relative to the biological reference points established by the fluke fishery management plan ("FMP"). AR 299. Previous assessments had overestimated recent years' stock biomass ("B") and underestimated the fishing mortality rate ("F"). AR 1025. SARC panelists accepted the recommendation of the Center to update the biological reference points in the FMP.

The Monitoring Committee met on July 28, 2005, to consider the latest information on the status of the summer flounder stock. AR 505. It recommended that a quota of 26 million

-4-

pounds be adopted for 2006, 2007, and 2008, an approach referred to as "constant harvest strategy." *Id.*

After considerable discussion, the Council adopted the Monitoring Committee's recommended quota approach. AR 506–552. It then submitted this recommendation to the Regional Administrator of the NMFS, together with an analysis of two other approaches: the status quo quota of 33 million pounds; and a "constant F strategy" that would set quotas for 2006, 2007, and 2008 equivalent to the level that has at least a 50 percent probability of success of ensuring that the specified F, "Fmax", will not be exceeded. Under the constant F strategy, the quota for 2006 would be 23.59 million pounds. AR 634.

The Regional Administrator concluded that adopting the Council's recommendation would be inconsistent with her obligation to publish a quota that has at least a 50 percent probability of success of ensuring that the specified F will not be exceeded. *See* C.F.R. § 648.100(d). She decided that neither the recommended quota nor the status quo quota would be consistent with this obligation. The constant harvest strategy of 26 million pounds had a 25 percent probability of success, while the status quo alternative of 33 million pounds exceeded the Fmax for 2006 by 51 percent. A quota of 23.59 million pounds was the only alternative that had been considered by the Council that could meet the requirement of a 50 percent probability of achieving the Fmax in 2006.

The Secretary of Commerce (the "Secretary") published a proposed rule to implement a 2006 quota of 23.59 million pounds. AR 936. After receiving numerous public comments on the proposal, a final rule implementing this quota was published on December 29, 2005. AR 1096.

Plaintiffs allege that the adoption of a 23.59 million pound quota violates National Standards One, Two, Six, and Eight of the Magnuson-Stevens Act, U.S.C. §1801 *et seq.* ("MSA"); that defendants failed to comply with the requirements of the Regulatory Flexibility Act, 5 U.S.C. § 60 *et seq.* ("RFA"), the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and Executive Order 12866; that defendant ASMFC violated the terms of the ACFCMA and its own voting rules and procedures; and that defendants violated the requirements of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA").

## III. Law

### A. Standard of Review of Administrative Decisions

The Secretary's actions are reviewed under the standards set by the APA. 16 U.S.C. § 1855(f)(1); 5 U.S.C. §§ 706(2)(A)-(D). Under the APA, agency action is only disturbed if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)(1980).

Review is "searching and careful" but "narrow"; the court may not substitute its judgment for that of the Secretary. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). The court defers to the agency where the agency's particular technical expertise is involved, as is the case in fishery management. *See, e.g.*, *National Fisheries Institute v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990) (It is "especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MPA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of

the relevant quantitative and qualitative factors." (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 150 (1988); *Marsh*, 490 U.S. at 378)).

Under the APA standard of review, the agency's actions are assumed to be valid. *See United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993). Plaintiffs bear the burden of showing, by citation to evidence in the administrative record, that an agency's actions are arbitrary and capricious. The court must consider the reasonableness of an agency action based on the record in existence at the time of the decision; it will not engage in an evidentiary hearing or a *de novo* review. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

### B. Fishery Quotas

Pursuant to the MSA, the Secretary, advised by the NMFS, sets annual quotas limiting each year's fluke catch. 16 U.S.C. § 1801, *et seq.* The NMFS relies on FMPs submitted by the RFMCs. FMPs must contain necessary and appropriate measures for conservation and management of the fishery. 16 U.S.C. § 1853(a)(1)(A). FMPs must also be "consistent with" the ten "national standards" set out by the MSA. *See* 16 U.S.C. § 1853(a).

All "[c]onservation and management measures shall prevent overfishing, while achieving on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(1). A fishery is "overfished" if the rate or level of fishing mortality ("F") jeopardizes the capacity of a fishery to produce the maximum sustainable yield ("MSY") on a continuing basis. 16 U.S.C. § 1802(29). The Secretary must confirm that the quota set by the FMP ensures that overfishing does not occur. Accordingly, the target F is set at the fishing

mortality rate that will maximize the harvest on a single class of fish over its entire life span ("Fmax").

The quota imposed must achieve, with at least 50 percent probability of success, a value of F that is equal to Fmax. *See* 50 C.F.R. § 648.100.

### C. Standard for Granting Summary Judgment

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). All facts and inferences are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348 (1986).

### IV. Application of Law to Facts

After extensive administrative hearings based on substantial reliable scientific evidence, total commercial and recreational landings of 23.59 million pounds of fluke on the East Coast for 2006 were allowed. Plaintiffs contend that the amount should be fixed at 26 million pounds.

Scientific data, public hearings, and administrative proceedings support the conclusion that 23.59 million pounds of fluke is the largest amount that will permit, with a 50 percent probability of success, achieving statutory and administrative goals designed to restore the healthy stock of fluke required by 2010. *See* 50 C.F.R. § 648.100(a) (The "Management Measures for the Summer Flounder [Fluke] Fisheries" requires a "50-percent probability of success" in achieving the target F, Fmax.); *Natural Resources Defense Council, Inc., v. Daley*, 209 F.3d 747, 754 (D.C. Cir. 2000) (stating that the total allowable landings "must have had at least a 50% chance of attaining" the target F).

The administrative system of control of our fisheries is exceedingly complex—requiring cooperation by a variety of federal and state agencies and many private conservation, commercial and other organizations. *See* Appendix A. Excellent briefs and four volumes of administrative records supplied by the parties fully support the finding now made that all administrative "t's" were crossed and "i's" dotted in arriving at the figure of 23.59 million pounds.

With federal and state control, and cooperation among the many agencies and private parties involved, the fluke fishing stocks in this area have improved dramatically over the last few years. If present federal and local policies are followed—and nature cooperates—the available healthy fluke population should by 2010 permit substantially higher sustainable fishing quotas. Even during the 2006 season there will be sufficient fluke available commercially to almost satisfy the public's appetite for this delectable fish. As for recreational fisherman, the size and abundance of fish this spring, summer, and fall, and predicted sunny skies, warm breezes and calm seas off of our beautiful beaches promise ample delight for sports-fishing. There is no reason to delay the opening of the season because of this litigation.

Plaintiffs' contention that the 23.59 million pound quota violates the "national standards" set forth in the MPA has no merit. The result was arrived at by statistical analysis and modeling, demonstrating that it has at least a 50 percent probability of success in ensuring that overfishing does not occur. Adoption of the 23.59 million pound limit fully complies with the "national standards" set forth in the MPA.

Plaintiffs' contention that the Secretary did not comply with the RFA because of a failure to consider and discuss the effect of the quota on small business, and neglect in not analyzing the effective alternatives that may minimize the quota's impact on such entities, has no merit. The record amply demonstrates that the Secretary complied with the RFA in considering the quota's impact on commercial and recreational fishing. Here, the difference between the quota suggested by plaintiffs and the quota adopted by the Secretary has a minimal effect on commercial and noncommercial fishery, but might have a major adverse impact on the future fluke fishing stock. The Secretary properly concluded that the impact of the 2006 23.59 million pound quota on non-governmental entities would not be significant. AR 632-917.

Plaintiff's contentions that the Secretary violated the NEPA and the APA have no merit.

## V. Declaratory Judgment

Plaintiffs have, in addition to requesting a change in the 2006 quota (TAL) for fluke, asked for a declaratory judgment as follows:

> 1. A declaratory judgment that NMFS has violated the Magnuson-Stevens Act and the APA by adopting the contested rule contrary to the National Standards.
> 2. A declaratory judgment that the contested rule from the ASMFC violates the mandates and policies of the ACFCMA.

3. A declaratory judgment that he Defendants have failed to comply with the mandates and requirements of the NEPA, the Regulatory Flexibility act, and that NMFS has failed to comply with Executive Order 12866.

Pl.'s Compl. ¶ 100.

The briefs have not addressed the request for a declaratory judgment. The issue was raised in passing, and then only in argument. *See* Tr. of Argument on April 28, 2006. While the matter is now decided for the 2006 fluke TAL, it is not mooted because it may arise again and again and is "capable of repetition, yet evading review." *Roe v. Wade*, 410 U.S. 113, 125 (1973) (*quoting Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911) (reviewing order of the ICC requiring operator of public shipping company to cease giving preferences to private citizens)).

While mootness is not a basis for refusing to decide the claims for a declaratory judgment, the case must nevertheless be completely dismissed. As already noted, the administrative agencies are operating in an appropriate manner, negating the need for a declaratory judgment.

## VI. Conclusion

The contested rule for a 2006 TAL of 23.59 million pounds for fluke was properly promulgated and should not be set aside. Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted. Judgment shall be entered for all defendants against all plaintiffs. The complaint is dismissed.

No stay is granted. No costs or disbursements are granted.

"Doubt not but angling will prove to be so pleasant that it will prove to be, like virtue, a reward to itself." Izaak Walton, The Compleat Angler, pt. I, ch. 1 (1653-1655), *quoted in* John Bartlett, Familiar Quotations 325 (14th ed. 1968).

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, New York
       May 1, 2006

## APPENDIX A

Glossary of Principal Agencies and Laws Implicated in Setting Quotas for Fluke Fishing (some of which are referred to in the memorandum to which the appendix is attached). *See also* 50 C.F.R. § 600.10; 16 U.S.C. § 1802; 16 U.S.C. § 5102 (for definitions); 50 C.F.R. § 600.15 (for other acronyms).

**ACFCMA** - Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. § 5101, *et seq.*, addressees the problem of fishery stocks common to waters under exclusive state jurisdiction, i.e., within 3 miles of the coast, and waters in the EEZ, which is under exclusive federal jurisdiction. The ACFCMA was enacted to "support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources." 16 U.S.C. § 5101(b).

**APA** - Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, requires federal agencies to consider the public comments it has received.

**ASMFC** - Atlantic States Marine Fisheries Commission ("Atlantic Commission"), ("Commission") - interstate compact created by the ACFCMA consisting of all East Coast states from Maine to Florida, as well as the District of Columbia, Potomac River Fishery Commission, the NMFS, and the United States Department of Fish and Wildlife. The commission prepares coastal fishery management plans for fisheries located in both state waters and the EEZ, but has no official role in the development of FMPs and no authority to craft an FMP or to submit a fisheries plan or regulation to the Secretary for review. 16 U.S.C. § 5104(a).

**"Atlantic Commission"** - *See* ASMFC.

**"B"** - biomass, the aggregate weight of the fishing stock of a particular species.

**BMSY** - the level of biomass that produces the MSY over time.

**CAR** - Committee Administrative Record.

**"Center"** - Northeast Fisheries Science Center, one of the five NMFS Fisheries Science Centers, which comprise the research arm of the NMFS.

**"Commission"** - *See* ASMFC.

**"Council"** - *See* MAFMC.

**EA** - Environmental Assessment - an assessment that determines whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an EIS.

**EEZ** - Exclusive Economic Zone, established by the MSA extending from 3 miles seaward of the states' coast to 200 nautical miles offshore. 16 U.S. C. §§ 1802(11), 1811.

**EIS** - Environmental Impact Statement, required by the NEPA with respect to proposed regulations and other major federal actions significantly affecting the quality of the environment.

**Executive Order 12866** - requires each agency to "tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations." 58 Fed. Reg. 51735, 51736.

**"F"** - fishing mortality rate.

**FAR** - Federal Administrative Record.

**Fluke** - *See* Summer flounder.

**Fmax** - the fishing mortality rate that will maximize the harvest of a single class of fish over its entire life span.

**FMP** - Fishery Management Plan - a plan prepared by each Regional Fishery Management Council for each fishery under its authority that requires conservation and management, which is submitted to the Secretary. 16 U.S.C. § 1852(h). *See also* 16 U.S.C. §§ 1802(28)(C), 1853.

**IFMP** - Interstate Fishery Management Plan.

**MAFMC** - Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council", "Council") one of the eight RFMCs established by the MSA. 16 U.S.C. § 1852(a)(1)(B).

**"Mid-Atlantic Council"** - *See* MAFMC.

**"Monitoring Committee"** - *See* SFMC.

**MRFSS** - Marine Recreational Fishing Statistical Survey - generates estimates of recreational summer flounder catch and landings estimates to submit to the SAW.

**MSA** - Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.*, passed to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles . . . ." 17 U.S.C. § 1801(b)(1),(3). The MSA establishes eight RFMCs, *see* 16 U.S.C. § 1852, and also requires that any FMP and any regulation promulgated to implement an FMP be consistent with ten "national standards" set forth. 16 U.S.C. § 1851(a).

**MSY** - maximum sustainable yield - "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i).

**NEPA** - National Environmental Policy Act - 42 U.S.C. § 4321, *et seq.*, requires all federal agencies to provide an EIS with respect to proposals for legislation and other major federal actions significantly affecting the quality of the environment.

**NMFS** - National Marine Fisheries Service - the federal agency, a division of the Department of Commerce, responsible for the stewardship of the nation's living marine resources and their habitat. NMFS is responsible for the management, conservation, and protection of living marine resources within the EEZ.

**NOAA** - National Oceanic and Atomospheric Administration - a federal agency focused on the condition of the oceans and the atmosphere.

**NRC** - National Research Council.

**NRDC** - Natural Resources Defense Council, Inc. - a national non-profit environmental organization dedicated to ensuring a safe and healthy environment for all living things.

**NS 1** - National Standard 1 - provides that "[c]onservation and management shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

**NS 2** - National Standard 2 - provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

**NS 6** - National Standard 6 - provides that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery

resources, and catches." 16 U.S.C. § 1851(a)(6).

**NS 8** - National Standard 8 - provides that "[c]onservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extend practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

**NYFTTA** - New York Fishing Tackle and Trade Association - a private fishery organization

**NYMTA** - New York Marine Trades Association - a private organization that represents marinas, at which recreational fishing boats engaged in the summer flounder fishery are kept and receive supplies and food.

**OY** - optimal yield - "the amount of fish which is prescribed . . . on the basis of maximum sustainable yield [MSY] from the fishery, as reduced by any relevant economic, social, or ecological factor." 16 U.S. C. § 1802(28)(B).

**Recreational Fishing Alliance** - a national, grassroots political action organization representing individual sport fishermen and the sport fishing industry.

**RFA** - Regulatory Flexibility Act, 5 U.S.C. §§ 601-604 - requires an agency to discuss the effects of a proposed rule on small businesses, alternatives that might minimize adverse economic consequences, and the reasons why it chose and rejected the alternatives. 5 U.S.C. § 604(a)(5).

**RFMC** - Regional Fishery Management Council - established by the MSA, and responsible for developing and recommending to the Secretary FMPs governing each fishery within its

geographic area. 16 U.S.C. § 1852.

**SARC** - Stock Assessment Review Committee.

**SAW** - Stock Assessment Workshop - analysis conducted by scientists from around the world who are experts in fisheries stock assessment methodology.

**"Secretary"** - Secretary of Commerce, who possesses final authority to approve federal FMPs under the MSA. 16 U.S.C. § 1854.

**SFA** - Sustainable Fisheries Act, Pub. L. No. 104-297, 110 Stat. 3559 (1996) - 1996 Amendment to the MSA.

**SFMC** - Summer Flounder Monitoring Committee ("Monitoring Committee") - a group whose composition is set by regulation (50 C.F.R. § 648.2) and which reviews existing scientific and other data concerning summer flounder and makes a recommendation to the Demersal Species Committee of the Council regarding the measures, including an annual quota, that have at least a 50 percent probability of success that the Fmax will not be exceeded.

**Summer flounder** - *paralichthys dentatus*, popularly known as fluke.

**TAL** - Total Allowable Landings - summer flounder quotas that fix the total weight of summer flounder that may be harvested by commercial and recreational fishermen (sometimes referred to as "quotas").

**USFWS** - United States Fishing and Wildlife Service.

**VPA** - Virtual Population Assessment - uses data from marine fish surveys and catch surveys to estimate central determinants of health and abundance of the fishery.